IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 14, 2018 Session

**IN RE ESTATE OF JOHN TYLER McKELVEY**

**Appeal from the Chancery Court for Franklin County**
**No. 2016-PR-133    Don R. Ash, Senior Judge**
_____

**No. M2017-01298-COA-R3-CV**
_____

This appeal arises from a declaratory judgment action seeking to determine whether the decedent died intestate. The decedent executed a will in 2005 and executed another will in 2011, which expressly revoked all prior wills and codicils. Following the decedent's death in 2016, the original of the 2011 will could not be located; however, the original of the 2005 will was found in the decedent's personal filing cabinet. The decedent's children then filed a Petition to Open Estate and [for] Declaratory Relief, seeking a declaration that the decedent died intestate. The decedent's live-in companion of approximately 30 years, and a beneficiary under both wills, filed an answer, contending that the decedent died testate under either the 2005 or the 2011 will. At the trial, the decedent's companion conceded that she did not have evidence to overcome the presumption that the decedent revoked the 2011 will; thus, the trial focused on whether the decedent intended to revive his 2005 will upon revoking the 2011 will. The trial court found "there is no proof Decedent revoked the 2011 Will with the intent to execute a later will," and "[g]iven the preservation and nearby-safekeeping of the 2005 Will following revocation of the 2011 Will and the lack of evidence indicating a contrary intent, the Court concludes Decedent intended to revive his 2005 Will." We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

David L. Stewart, Winchester, Tennessee, for the appellants, Teresa S. Payne, William T. McKelvey, and Trudy McKelvey Edwards.

John H. Baker, III, Murfreesboro, Tennessee, for the appellee, Rebecca Dudley.

**OPINION**

John Tyler McKelvey ("Decedent") died in Winchester, Tennessee on March 24, 2016, at age 77. He was survived by three adult children, Teresa S. Payne, William T. McKelvey, and Trudy McKelvey Edwards (collectively, "Decedent's children") and his live-in companion of approximately 30 years, Rebecca Dudley, all of whom are beneficiaries under both the 2005 and 2011 wills.

After Decedent's children filed the petition to contest both wills and Ms. Dudley filed her answer insisting that one or both of the wills was valid, the trial court opened the estate and issued letters of administration *pendente lite* to Decedent's son, William McKelvey. The order also recited that "a dispute exists as to whether John Tyler McKelvey died leaving a proper Will and thus, a determination must be made as to the validity of the Wills attached to the Petition."

In the May 9, 2005 will, which was prepared by Decedent's daughter, Trudy Edwards, a licensed attorney, Decedent designated his son, William, as the executor of his estate. The 2005 will bequeathed a portion of his real and personal property to each of his three children and granted Ms. Dudley a life estate in "the house, vehicle, garage, and yard . . . provided no other male resides with her," with the entire residuary estate going to his son William. The parties do not dispute that the 2005 will was validly executed and stored in a personal filing cabinet located in Decedent's home.

The later will, executed on March 21, 2011, expressly "revoke[d] and render[ed] null and void any and all other [prior] wills, codicils and testamentary instruments." It also designated his son, William, as the executor of his estate, and it bequeathed a portion of Decedent's real and personal property to each of his three children. Also similar to the 2005 will, the 2011 will granted Ms. Dudley a life estate "in [Decedent's] home, well house, garage and chicken coop" along with an easement to access those structures. However, unlike his 2005 will, the 2011 will divided the residuary estate equally among his children. Although the original of the 2011 will was never located, the law firm that prepared the 2011 will filed a signed copy with the court.

At trial, it was undisputed that the original of the 2011 will could not be found, and the parties stipulated that the original 2005 will was found at the bottom of Decedent's personal filing cabinet underneath some papers. Because Ms. Dudley conceded that there was no evidence to rebut the presumption that Decedent revoked his 2011 will, the trial focused on whether Decedent intended to revive the 2005 will upon revoking the 2011 will.

Decedent's three children, his granddaughter, and Ms. Dudley testified at trial. Ms. Dudley stated that Decedent expressed his intent to revive the 2005 will by preserving it in his personal filing cabinet. Decedent's children stated that Decedent kept his most

important papers in his safe, not in his personal filing cabinet; Decedent frequently expressed dissatisfaction with the 2005 will; and Decedent expressed the intent to make a new will after 2011.

At the conclusion of the trial, the trial court held that the presumption that Decedent destroyed the 2011 will, which arose from the inability to locate the original will, was not overcome and that the 2011 will was of no effect. The court found that the original 2005 will was located "in a safe in Decedent's home beneath other papers" and ruled:

> At trial, scant evidence was submitted regarding Decedent's intent. To be sure, destroying a second will with the intent to execute a third will does not revive the first will. However, there is no proof Decedent revoked the 2011 Will with the intent to execute a later will. Our Supreme Court has held "when the older will is in existence, and is carefully preserved by the testator after the destruction of the later, and no other facts appear, there can be but little question that it was the intention of the testator to republish the former will." Given the preservation and nearby-safekeeping of the 2005 Will following revocation of the 2011 Will and the lack of evidence indicating a contrary intent, the Court concludes Decedent intended to revive his 2005 Will. Accordingly, the Court finds Decedent did not die intestate, but under the revived Last Will and Testament of John Tyler McKelvey executed May 9, 2005.

(Citations omitted).

Decedent's children appealed.

## STANDARD OF REVIEW

In actions tried without a jury, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006). Our review of a trial court's determinations on issues of law is de novo, without any presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

ANALYSIS

The dispositive issue on appeal is whether the trial court erred by reviving Decedent's 2005 will. Decedent's children challenge the trial court's ruling on three fronts. First, they contend its ruling was based on an erroneous finding of fact, which pertained to where the original of the 2005 will was found after Decedent's death. Second, they contend the trial court did not properly apply the law as to the revival of a revoked will. And third, they contend Ms. Dudley's evidence is insufficient to show that Decedent intended to revive the 2005 will when weighed against the children's evidence of his intent to make a new will after 2011.

A later will which contains a clause revoking all prior wills, as is the case here, does not necessarily render an earlier will null and void. *See Ewell v. Rucker*, 187 S.W.2d 644, 647 (Tenn. Ct. App. 1945). An express revocation clause in a later will, like any provision in a will, remains tentative "until the death of the testator calls the will into operation." 1 Jack W. Robinson, Sr., et al., *Pritchard on Wills and Administration of Estates*, § 299, at 4-41, (7th ed.). Thus, an express revocation in a later will, which has itself been revoked, does not support nor does it prevent the revival of an earlier will. *Ewell*, 187 S.W.2d at 647. "The legal presumption is neither adverse to nor in favor of the revival; but the question is one of intention purely, open to decision either way, solely according to the facts and circumstances." *Id*.

Accordingly, the proponent of revival must show by a preponderance of the evidence that upon revoking the later will, the decedent intended to revive the earlier will. *See id.; see also McClure v. McClure*, 6 S.W. 44, 46 (Tenn. 1887); *In re Estate of Powell*, No. E2007-0348-COA-R3-CV, 2007 WL 3087687, at *5 (Tenn. Ct. App. Oct. 24, 2007). When the decedent merely preserves the earlier will, there is a "bare presumption" of the intent to revive it. *Ewell*, 187 S.W.2d at 648. However, this bare presumption vanishes when there is evidence of the decedent's intent to make a third will. *Id*. "[W]hen the older will is in existence, and is carefully preserved by the testator after the destruction of the later, and no other facts appear, there can be but little question that it was the intention of the testator to republish the former will." *McClure*, 6 S.W. at 46.

## A. FINDINGS OF FACT

Decedent's children contend the trial court's ruling was based on an erroneous finding of fact, that "the original, signed 2005 Will was found in a safe in Decedent's home beneath other papers." The undisputed fact is that the 2005 will was found in Decedent's filing cabinet beneath other papers, not in his safe. Nevertheless, this erroneous finding must be considered along with the trial court's other specific findings of fact which are supported by a preponderance of the evidence. In pertinent part, the trial court made the following findings of fact:

John Tyler McKelvey died in Winchester, Tennessee, on March 24, 2016, a resident of Franklin County, Tennessee, at age seventy-seven. He was of sound mind until the time of death.

Decedent is survived by three children: Teresa S. Payne, William T. McKelvey and Trudy McKelvey Edwards (collectively, "Children"). Decedent lived with his girlfriend, Rebecca Dudley, for approximately thirty years at his home located at 554 Bland Road, Estill Springs, Franklin County, Tennessee.

On May 9, 2005, Decedent properly executed his Last Will and Testament naming his son, William, executor. (Petition Ex. 1). In the 2005 Will, Decedent divided his real property and guns between his Children with a remainder interest in all property to his son, William. However, he also granted Ms. Dudley a life estate in "the house, vehicle garage, and yard . . . provided no other male resides with her" and he directed she "be responsible for the maintenance and upkeep, insurance, and real property taxes" associated with her life estate. Additionally, he bequeathed to Ms. Dudley a bed frame and allowed her to use a specific lawnmower during her life tenancy. After Decedent's death, the original, signed 2005 Will was found in a safe in Decedent's home beneath other papers.

On March 21, 2011, Decedent purportedly executed a second Will again naming his son, William, executor. (Petition Ex. 2). The Will expressly "revoke[d] and render[ed] null and void any and all other [prior] wills, codicils and testamentary instruments[.]" In the 2011 Will, Decedent bequeathed his real and personal property—specifically, guns, vehicles, firearms, certain appliances, farm equipment and tools—to his Children. In contrast to the 2005 Will, he left his residuary estate equally to his Children. Decedent granted Ms. Dudley "a life estate interest in [Decedent's] home, well house, garage and chicken coop" along with an easement "to access said structures[.]" He also conveyed to Ms. Dudley a fee simple interest in a gun, a vehicle, two cows, chickens and certain furniture and appliances and a life interest in two dressers, a safe, a bed frame and a lawnmower, with the remainder interest to William. The original 2011 Will has not been located; pursuant to a subpoena, a signed copy was provided by the law firm which prepared it.

Decedent's son William T. McKelvey testified, shortly before Decedent's death, Decedent asked Ms. Dudley to retrieve certain documents from a safe located in his home. She located the requested envelope and brought it to Decedent; she did not look inside. The nursing home facility copied the documents, returned the originals to Decedent, and Decedent gave the

documents to son, William T. McKelvey, who destroyed them after Decedent's death. Pursuant to a subpoena, the nursing home provided copies of a Living Will and Power of Attorney—both dated March 21, 2011; the nursing home records contained no Will.

Jenny Payne, Decedent's granddaughter who worked in a law firm, testified Decedent complained about the 2005 Will and she advised him he could tear it up if he wanted.

Though the trial court stated the 2005 will was found in Decedent's "safe," when in fact it was found in his filing cabinet, we shall consider this fact in the context of the court's other findings, as well as the evidence in the record, to determine if the trial court properly applied the law to revive the 2005 will.

## B. APPLICABLE LEGAL PRINCIPLES

Decedent's children contend the trial court did not properly apply the law as to the revival of a revoked will.

After determining the 2011 Will was revoked, the trial court turned its attention to the 2005 Will and stated in its Conclusions of Law analysis:

In Tennessee, "the mere act of revocation of a subsequent inconsistent, or revocatory will does not of itself revive a former will and creates no presumption for or against revival, but the question to be determined from all the facts and circumstances is the intention of the testator." *Wrinkle v. Williams*, 260 S.W.2d 304, 309 (Tenn. Ct. App. 1953) (citing *McClure v. McClure*, 86 Tenn. 173, 176, 6 S.W. 44 (1887); *Ewell v. Rucker*, 28 Tenn. App. 156, 187 S.W.2d 644 (1945)). Revocation "'alone would furnish too slight a basis upon which to find the testator's intention.' *In re Estate of Powell*, No. E2007-0348-COA-R3-CV, 2007 WL 3087687, at *5 (Tenn. Ct. App. Oct. 24, 2007) (quoting *Ewell*, 187 S.W.2d at 647-48). Instead, "'[i]t is necessary to prove circumstances bearing on the intention to revive the first will.'" *Id.* (quoting *Ewell*, 187 S.W.2d at 647-48). Where "'the circumstances indicate an intention to die intestate[,] the former will cannot be admitted to probate." *Id.* (quoting *Ewell*, 187 S.W.2d at 647-48).

In addition to the above, the trial court went on to note that "destroying a second will with the intent to execute a third will does not revive the first will. *McClure*, 6 S.W. at 46." Additionally, the trial court correctly recited our Supreme Court holding in *McClure*: "when the older will is in existence, and is carefully preserved by the testator after the destruction of the later, and no other facts appear, there can be but little question that it was the intention of the testator to republish the former will." *Id*.

- 6 -

The foregoing reveals that the trial court correctly identified the legal principles that are to be applied to the facts and issues presented. Therefore, we now consider whether the facts and law support the trial court's decision to revive the 2005 will.

## C. WHETHER THE 2005 WILL WAS ERRONEOUSLY REVIVED

Decedent's children contend the evidence is insufficient to show that Decedent intended to revive the 2005 will when weighed against the children's evidence of his intent to make a new will after 2011.

Ms. Edwards, Decedent's daughter and the attorney who prepared the 2005 will, testified that Decedent told her in 2014 that he had recently prepared a new will leaving everything to his son. Although evidence of an intent to make a new will is generally enough to overcome the "bare presumption" that arises in favor of revival when the prior will was preserved, the evidence here preponderates in favor of finding that Decedent intended to revive the 2005 will. As we discuss in more detail below, Decedent preserved his 2005 will even though his family advised him to destroy it; the 2005 will divides Decedent's estate in a manner that is consistent with the wishes he expressed shortly before his death; Decedent did not make a new will near the end of his life, and the only will in existence when he died was the 2005 will; and Decedent's repeatedly-expressed desires for the distribution of his estate were never compatible with an intestate distribution.

First, as a preliminary matter, it is important to note that while Decedent's children presented testimony that Decedent claimed to have prepared a new will in 2014, the alleged will was never found nor seen by any of the witnesses, and Decedent's children presented no other evidence that it was ever executed. To the contrary, the preponderance of the evidence supports a finding that Decedent only executed the 2005 and 2011 wills.

Nevertheless, Decedent's children also offered evidence that Decedent was dissatisfied with his 2005 will, and thus, would not want to revive it. However, while Decedent told Ms. Edwards and his granddaughter, Jennie Payne, that he was unhappy with the 2005 will, he preserved it, even though both advised him to destroy it near the time of its execution. Ms. Edwards testified:

> Shortly after [Decedent] signed [the 2005 will] he called me. He was very upset and said it contained terms that he no longer desired. I didn't question about what specific terms, but I – we discussed what to do when it contained terms that he didn't – no longer wanted. . . . I advised him that – you know, to destroy it.

Likewise, Ms. Payne testified that Decedent told her he did not like his 2005 will, and she told him "all he had to do was tear it up." The fact that Decedent did not destroy the 2005 will is evidence that he preferred the 2005 will to no will.

In fact, Decedent made it clear to his granddaughter, who worked for Ms. Edwards' law firm, that he wanted to have a will, and he visited her office regularly to discuss the way in which he wanted to divide his estate. In these discussions, Decedent's desires were never consistent with an intestate distribution. Ms. Payne, testified:

> A. [Decedent] told me multiple times what he wanted [to happen with his estate], and throughout the years it changed just a little bit. But he did repeatedly tell me different things.

> . . .

> Q. Okay. And you told us generally that he had these different desires as to what he wanted to happen. Can you remember specifically some of the things that he told you and approximately when he told you these things?

> A. The first time he kind of talked about it was close to the time that [Ms. Edwards] did the [2005 will]. And he was saying that he wanted Ms. Dudley to stay [in his home] until she passed, as long as she did not have a boyfriend. . . . After that he told me that, of course, Bill got everything.

> Q. You are saying at one point he expressed that his son, Bill McKelvey, would be – would receive everything?

> . . .

> A. That was around the same time that [Ms. Edwards] did the will, said that Bill got everything, all the land, everything. A few years – probably three or four years before he passed, he told me that Bill was going to get all the stuff, the majority of the land, and that my mom, Teresa, would get part of the land. Then probably about two years before he passed, he started telling me that he was going to divide the land between all the kids, and that Bill got all the stuff, but that the land would be divided between the kids….

If Decedent were to die intestate, all of his real and personal property would be distributed equally among his children, and, considering the foregoing testimony, Decedent never expressed a desire consistent with that arrangement. *See* Tenn. Code Ann. § 31-2-104(b)(1). Therefore, while the testimony shows that Decedent was sometimes indecisive about the way he wanted to divide his property, his desire to avoid an intestate distribution remained constant.

Perhaps most significant is that close to the end of his life, Decedent told his daughters and his granddaughter how he wanted to distribute his property upon his death, and it was in a manner not entirely inconsistent with his 2005 will. More importantly, there was never an indication that Decedent intended to deprive Ms. Dudley of a life estate in his home and other property. To the contrary, the only desired changes he expressed pertained to the bequests to his children.

Decedent's daughter, Teresa Payne, testified that Decedent told her in two conversations, one that occurred six months before his death and the other that occurred two weeks before his death, that "he was going to give me and Trudy and Bill some land, and then he was going to give Bill the rest of it, the rest of his stuff." Likewise, Decedent's granddaughter, Jennie Payne, testified, "[T]he last six months, he repeatedly told me he was going to take care of his kids. The kids would get the land. Bill got all the stuff." Furthermore, in these discussions, he never expressed a desire to revise or delete the bequest of a life estate to Ms. Dudley.

Ms. Edwards testified that after telling her that he prepared a new will in 2014, Decedent contacted her approximately four months before he died:

> [H]is health was already failing and he had stated that he wanted to change his will, and provide for the three kids to get the—divide the land up, but he was going to leave everything else to Bill. And I advised him at that time that he shouldn't do it, because I just think it's bad course when you get towards the end of life and your health is failing, to be making changes as a matter of practice. And when we ended the phone call, it was my understanding that he was going to not take any further action and leave the prior will standing. . . .

The last sentence quoted above reveals Decedent's intention to not die intestate. To the contrary, he intended to "leave the prior will standing." The only uncertainty from his statement is which prior will. Significantly, Decedent's expressed wishes to Ms. Edwards were consistent with the 2005 will, which bequeathed a life estate to Ms. Dudley, his real property to each of his three children, and the rest and residue of his estate to his son William. The only inconsistency between Decedent's expressed wishes and the 2005 will pertained to the distribution of the personal property, which the 2005 will divided among all three children.

Furthermore, the 2005 will provided for Ms. Dudley, Decedent's close companion of approximately 30 years, because Ms. Dudley would receive nothing if Decedent died intestate. Ms. Dudley testified that though she and Decedent never married, they lived together as husband and wife, and they remained in a loving relationship up until the end of Decedent's life. The evidence shows that Decedent wanted to provide for Ms. Dudley

upon his death. As previously stated, both the 2005 and 2011 wills leave Ms. Dudley a life estate in Decedent's home, where he and Ms. Dudley resided together during the entire course of their relationship, except for one year. Though Decedent changed his mind concerning what and how much property would go to his children, there is no evidence that he wavered in his desire to provide a life estate to Ms. Dudley.

As the trial court correctly noted, it is significant that that Decedent did not destroy the 2005 will. Although the trial court erroneously stated that it was found in a "safe," the 2005 will was kept in a safe place, that being in Decedent's personal filing cabinet, and Decedent preserved his 2005 will even though he was advised to destroy it. Additionally, as we discussed earlier, the 2005 will distributes Decedent's property in a manner that is generally consistent with the wishes he expressed close to the time of his death, and Decedent did not want to die intestate. As the trial court correctly stated, *inter alia,* in its conclusions of law,

> Given the preservation and nearby-safekeeping of the 2005 Will following revocation of the 2011 Will and the lack of evidence indicating a contrary intent, the Court concludes Decedent intended to revive his 2005 Will. Accordingly, the Court finds Decedent did not die intestate, but under the revived Last Will and Testament of John Tyler McKelvey executed May 9, 2005.

For the foregoing reasons, we affirm the trial court's decision to revive the 2005 will.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, Teresa S. Payne, William T. McKelvey, and Trudy McKelvey Edwards.

_____
FRANK G. CLEMENT JR., P.J., M.S.